504 S.E.2d 605

**John Kevin CLARK and Maggie Lee Anderson, Respondents,**

v.

**Annette Rochelle CANTRELL, Appellant.**

**No. 2879.**

Court of Appeals of South Carolina.

Heard March 4, 1998.

Decided Aug. 10, 1998.

Rehearing Denied Sept. 17, 1998.

434

436

438

Jack D. Griffeth and D. Sean Faulkner, both of Love, Thornton, Arnold & Thomason, Greenville; and Robert Bethune King, Anderson, for appellant.

J. David Standeffer and James P. Brislane, both of Standeffer & Brislane; and Raymond Allen Tate, Jr., of Doyle & O'Rourke, Anderson, for respondents.

HEARN, Judge:

Respondents John Kevin Clark and Maggie Lee Anderson brought this negligence action against Annette Rochelle Cantrell after an automobile wreck between Anderson and Cantrell. The jury returned a verdict finding Cantrell eighty-four

percent at fault and liable for actual and punitive damages totaling $78,000 and $25,750, respectively. The trial court reduced actual damages by sixteen percent in proportion to Anderson's comparative negligence. Cantrell appeals, claiming the trial judge should have similarly apportioned the punitive damages and alleging numerous other errors. We disagree and affirm.

## FACTS

On November 1, 1993, Anderson was driving an Oldsmobile belonging to Clark in Anderson County. David James was a passenger in the car. As Anderson turned left across a four-lane road into a gas station's service area, Cantrell, who was traveling in her car from the opposite direction, hit the rear passenger side of the Oldsmobile. The impact from the collision threw James from the car. Anderson and Clark sustained personal injuries. James died at the scene.

Several witnesses testified during trial about Cantrell's speed and reckless disregard for the safety of others. One witness and her husband "were scared to death" after Cantrell passed them. They assumed that Cantrell, whose hazard lights were flashing, was driving fast in order to reach a hospital. It appeared to them that Cantrell was driving so fast she could have killed someone. Another witness stated that when Cantrell crossed the intersection through a yellow traffic light, she "was driving very fast [with] hazard lights on." Cantrell's speed, he explained, "shook me up." A trooper who examined the scene estimated Cantrell's speed to have been between 67–71 miles per hour, almost twice that allowed in the 35 miles per hour business zone. Finally, one of Cantrell's experts, who estimated her speed to have been 57 miles per hour, conceded that had she followed the posted speed limit, she could have controlled her car and stopped without colliding with Anderson and James.

Evidence was also elicited concerning Cantrell's attitude following the accident. First, despite the accident's severity, Cantrell's immediate inquiry after the crash was not about the people injured, but about the condition of her car.[1] Second,

1. Addie Lowe testified that after the accident, she and her husband saw James lying on the sidewalk. Cantrell "was screaming and hollering

the same trooper who estimated Cantrell's speed reported that she laughed repeatedly during their interview. Finally, the only reason Cantrell offered to justify her speed was that she was in a rush to find a gas station because her car was about to run out of gas.

## *DISCUSSION*

### I. Punitive Damages

Cantrell argues because punitive damages have a compensatory component in South Carolina, they should bear a reasonable relationship to the plaintiff's conduct and should be reduced by the amount of the plaintiff's negligence. We disagree.

The primary focus of punitive damages is on the defendant's wrongdoing. F. Patrick Hubbard & Robert L. Felix, *Comparative Negligence in South Carolina: Implementing Nelson v. Concrete Supply Co.*, 43 S.C.L.Rev. 273, 314 (1992). By contrast, compensatory damages depend on the plaintiff's injury, not the defendant's behavior, and involve a different standard of proof. *Id.* at 314.

Comparative negligence is the law in South Carolina. *Nelson v. Concrete Supply Co.*, 303 S.C. 243, 244–45, 399 S.E.2d 783, 784 (1991). While this court has recently re-examined several traditional tort doctrines in light of *Nelson,* not every tort concept is affected by the adoption of comparative negligence. *Compare Fernanders v. Marks Constr. of S.C., Inc.,* 330 S.C. 470, 499 S.E.2d 509 (Ct.App.1998) (joint and several liability survives adoption of comparative negligence) *with Davenport v. Cotton Hope Plantation Horizontal Property Regime,* 325 S.C. 507, 516, 482 S.E.2d 569, 574 (Ct.App.1997) (7–2 decision), *cert. granted in part,* (Aug. 8, 1997) *and Spahn v. Town of Port Royal,* 326 S.C. 632, 638–41, 486 S.E.2d 507,

---

... saying 'Look what they've done.... Look what they did to my car. They tore my car up.'" William Bernard Brantley testified that when he asked Cantrell about the accident, she kept repeating, "My car, my car, my car." He added: "I thought it was pretty sad that she was worried about her car when she had just hit somebody and she wasn't worried about whether they were hurt or not.... [She was] only worried about her car." Trooper Bruce Block offered similar testimony. Cantrell explained she inquired about her car because it was the "first thing" she saw.

510–12 (Ct.App.1997), *aff'd as modified,* 330 S.C. 168, 499 S.E.2d 205, 208 (1998) (holding assumption of risk and last clear chance are merely factors for the jury to consider in apportioning negligence). We decline to impose a comparative negligence calculus on punitive damages because of the conflicting functions these legal concepts serve.

Although punitive damages have received increasing academic criticism in recent years,[2] the doctrine's viability is unchallenged in South Carolina's jurisprudence. Unlike comparative negligence, which allocates loss according to relative fault, the primary purposes of punitive damages are punishment and deterrence. *Gamble v. Stevenson,* 305 S.C. 104, 110, 406 S.E.2d 350, 354 (1991). In addition to these two goals, the South Carolina Supreme Court has recognized that it also "vindicate[s] a private right." *Id.* While several cases conclude this vindicative quality adds a compensatory purpose,[3] the terms "vindication" and "compensation" are not synonymous. *See generally* 22 Am.Jur.2d *Damages* §§ 3, 23–24, 731,

---

**2.** *See generally* A. Mitchell Polinsky & Steven Shavell, *Punitive Damages: An Economic Analysis,* 111 Harv.L.Rev. 869 (1998) (debating efficiency of punitive damages and suggesting economic methods for achieving goals of punishment and deterrence); David G. Owen, *A Punitive Damages Overview: Functions, Problems, and Reform,* 39 Vill. L.Rev. 363 (1994) (discussing controversial nature of punitive damages and including overview of critical commentary and proposals for reform).

**3.** References are made to the incidental compensatory aspect of punitive damages in the following cases, but only to the extent they unavoidably become part of the plaintiff's total recovery: *Hughey v. Ausborn,* 249 S.C. 470, 481, 154 S.E.2d 839, 844 (1967); *Hicks v. Herring,* 246 S.C. 429, 437–38, 144 S.E.2d 151, 155 (1965); *Rogers v. Florence Printing Co.,* 233 S.C. 567, 573, 106 S.E.2d 258, 261 (1958); *Mock v. Atlantic Coast Line R. Co.,* 227 S.C. 245, 267, 87 S.E.2d 830, 840 (1955); *Watts v. South Bound R. Co.,* 60 S.C. 67, 70, 38 S.E. 240, 242 (1901). Similarly, the Federal District Court for South Carolina has noted punitive awards "compensate the victim for his attorneys' fees, which are normally taken out of his compensatory damage verdict, and for other expenses for which the jury does not award compensatories." *Campus Sweater & Sportswear Co. v. M.B. Kahn Constr. Co.,* 515 F.Supp. 64, 105 (D.C.S.C.1979), *aff'd,* 644 F.2d 877 (4th Cir.1981). Thus, while courts may use the term "compensate" to describe the ultimate effect of punitive awards, they do not employ the term to describe a compensatory purpose in the sense of reimbursing a victim for actual damages.

733 (1988) (discussing the different functions of compensatory and punitive damages).

■ Vindication denotes punishment and revenge. By contrast, compensation represents an offset or reimbursement which restores an injured party to the status quo. *Random House Unabridged Dictionary of the English Language* 417, 2123 (2d ed. 1987) *and Webster's Third New International Unabridged Dictionary* 463, 2553 (1961). Our supreme court has explained, "punitive damages are not given with a view to compensation, [but] in addition to compensation...." *Shuler v. Heitley,* 209 S.C. 198, 202, 39 S.E.2d 360, 361–62 (1946). Moreover, *Gamble* does not require juries to expressly apportion punitive damages, even though juries consider many factors in determining whether to award punitive damages. *Gamble v. Stevenson,* 305 S.C. 104, 110, 406 S.E.2d 350, 354 (1991). Thus, any compensatory purpose served by punitive damages is merely incidental.[4] We hold, therefore, that punitive damages are not subject to reduction under a comparative negligence scheme.[5]

---

4. In three states, punitive damages are awarded primarily to compensate and incidentally to punish. *E.g., Doroszka v. Lavine,* 111 Conn. 575, 150 A. 692, 692–93 (1930); *Santos v. Lumbermen's Mut. Cas. Co.,* 408 Mass. 70, 556 N.E.2d 983, 990 (1990); *Kewin v. Massachusetts Mut. Life Ins. Co.,* 409 Mich. 401, 295 N.W.2d 50, 55 (1980). Under this theory, punitive damages are awarded because aggravating circumstances have increased actual damages. These cases appear to be based on the belief that punitive damages compensate the plaintiff for indignity suffered by reason of the defendant's reprehensible conduct. South Carolina courts, in addition to the vast majority of other jurisdictions, have never adopted this view.

5. As of this writing, sixteen reported decisions have discussed the interrelationship between punitive damages and comparative negligence. With the exception of *Parr v. Central Soya Co., Inc.,* 732 F.Supp. 738, 742–44 (E.D.Mich.1990), no other decision has allowed reduction: *Amoco Pipeline Co. v. Montgomery,* 487 F.Supp. 1268, 1272–73 (W.D.Okla.1980); *Tampa Elec. Co. v. Stone & Webster Eng'g Corp.,* 367 F.Supp. 27, 38 (M.D.Fla.1973); *Davis v. Lira,* 817 P.2d 539, 542 (Colo.Ct.App.1991), *rev'd on other grounds,* 832 P.2d 240 (Colo.1992); *Robbins v. McCarthy,* 581 N.E.2d 929, 934 (Ind.Ct.App.1991); *Godbersen v. Miller,* 439 N.W.2d 206, 209 (Iowa 1989); *Bowman v. Doherty,* 235 Kan. 870, 686 P.2d 112, 122 (1984); *Wolf v. Goodyear Tire & Rubber Co.,* 808 S.W.2d 868, 875 (Mo.Ct.App.1991); *Shahrokhfar v. State Farm Mut. Auto. Ins. Co.,* 194 Mont. 76, 634 P.2d 653, 658–59 (1981); *Blazovic v. Andrich,* 124 N.J. 90, 590 A.2d 222, 231–32 (1991);

Finally, Cantrell maintains the trial court erred in refusing to strike punitive damages from Clark and Anderson's complaints. We disagree.

■■■ Punitive damages are awarded to punish wrongdoers for reckless, willful, wanton, or malicious behavior. *Gilbert,* 255 S.C. at 500, 179 S.E.2d at 723. Cantrell's excessive speed, coupled with her disregard for the commercial nature of the area, lack of remorse, and frivolous reason for speeding, demonstrate her reckless, willful, wanton, and malicious conduct. The trial court, therefore, properly refused Cantrell's motion to strike and correctly submitted the issue of punitive damages to the jury.

## II. Directed Verdict/Judgment Notwithstanding the Verdict

■■ In reviewing the denial of motions for directed verdict and judgment notwithstanding the verdict (JNOV), this court must view the evidence and its inferences in the light most favorable to the opposing party. *Tubbs v. Bowie,* 308 S.C. 155, 157, 417 S.E.2d 550, 552 (1992).

■■■ Relying on *Horton v. Greyhound Corp.,* 241 S.C. 430, 437, 128 S.E.2d 776, 780 (1962), and its progeny, Cantrell argues she was entitled to a directed verdict or JNOV because her speed was not the proximate cause of the accident. Cantrell, however, misapprehends *Horton*'s holding. Proximate cause requires (1) causation in fact and (2) legal cause. Causation in fact is proved by establishing the injury would not

---

*Comeau v. Lucas,* 90 A.D.2d 674, 455 N.Y.S.2d 871, 873 (1982); *Oberg v. Honda Motor Co., Ltd.,* 108 Or.App. 43, 814 P.2d 517, 522–23 (1991), *aff'd,* 320 Or. 544, 888 P.2d 8 (1995), *cert. denied,* 517 U.S. 1219, 116 S.Ct. 1847, 134 L.Ed.2d 948 (1996); *Summit Fasteners, Inc. v. Harleysville Nat'l Bank & Trust Co., Inc.,* 410 Pa.Super. 56, 599 A.2d 203, 206 (1991), *appeal denied,* 530 Pa. 633, 606 A.2d 902 (1992); *Hondo's Truck Stop Cafe, Inc. v. Clemmons,* 716 S.W.2d 725, 726 (Tex.App.1986); *Tucker v. Marcus,* 142 Wis.2d 425, 418 N.W.2d 818, 828 (1988). Commentary on this subject is limited. *See generally* Annotation, *Application of Comparative Negligence in Action Based on Gross Negligence, Recklessness, or the Like,* 10 A.L.R.4th 955–57 (1981); James D. Ghiardi, *Comparative Negligence: Effect on Punitive Damages,* 10 J.Prod.Liab. 253 (1987); Victor E. Schwartz, *Comparative Fault and Punitive Damages—Balancing the Equities, They Must Intersect,* 23 Mem.St.U.L.Rev. 125 (1992).

have occurred "but for" the defendant's negligence, while legal cause hinges on foreseeability. *Seals v. Winburn,* 314 S.C. 416, 418, 445 S.E.2d 94, 96 (Ct.App.1994). Our supreme court explained the limited application of the *Horton* line of cases in *Tubbs v. Bowie,* 308 S.C. 155, 417 S.E.2d 550 (1992):

> Each of those cases involved entry of a vehicle from a servient roadway onto the main highway, in such an abrupt fashion that an accident could not have been avoided, notwithstanding the excessive speed of the oncoming vehicle. In *Blanding* [*v. Hammell,* 267 S.C. 352, 228 S.E.2d 271 (1976) ], we noted
>
> > In those rare cases ... where speed has not been a causative factor, the court has focused on the *inevitability of the accident,* irrespective of the defendant's speed, due to an unexpected entry of the plaintiff into the defendant's right of way. Of course, *in most automobile accident cases, speed creates imponderable issues of time and distance which must be resolved by the jury.*

*Id.* at 158, 417 S.E.2d at 552 (emphasis supplied in original).

In this case, sufficient evidence supports the jury's finding that Cantrell's speed contributed to the accident. We cannot hold as a matter of law that Cantrell's speed was not the proximate cause.

### III. Jury Charges

"It is the trial court's function to charge the jury on the applicable law as raised by the pleadings and supported by the evidence. In order to warrant reversal for failure to give a requested charge, the refusal must be both erroneous and prejudicial." *Dalon v. Golden Lanes, Inc.,* 320 S.C. 534, 540, 466 S.E.2d 368, 372 (Ct.App.1996) (citations omitted).

Cantrell argues the trial court erred in failing to instruct the jury on the reasoning of *Horton v. Greyhound* and its progeny. The trial court stated it could not hold as a matter of law the accident was inevitable; therefore, the jury could find speed was a contributing factor to the accident. For the reasons stated above, we find no error.

Cantrell also argues the trial court erred in refusing to charge the jury on the law of sudden emergency. We

disagree. This doctrine protects a driver who is suddenly placed in an emergency and is compelled to act instantly to avoid a collision or an injury. *Benchoff v. Morgan,* 302 S.C. 116, 119, 394 S.E.2d 19, 20–21 (Ct.App.1990). The driver is not guilty of negligence if he makes a choice a person of ordinary prudence placed in such a position might make, even though it may not be the wisest choice. *Id.* The emergency must be caused by the negligence of another person and not the negligence of the driver. *Id.* Because there was uncontradicted evidence Cantrell was speeding, thus contributing to the emergency by her own negligence, the trial court correctly refused Cantrell's request to charge.

## IV. Evidentiary Issues

The admission or exclusion of evidence is a matter within the sound discretion of the trial court and absent clear abuse, will not be disturbed on appeal. *Gamble v. International Paper Realty Corp.,* 323 S.C. 367, 373, 474 S.E.2d 438, 441 (1996).

### A. Video animation

Cantrell attempted to introduce a video containing a computer-generated simulation of the accident through her expert witness. The trial court denied the video's admission, finding it inconsistent with prior testimony, including that of Cantrell's expert witness. The court also found that it inaccurately reflected the other evidence and would, therefore, confuse and mislead the jury. Cantrell alleges that this decision was error. We find no abuse of discretion in the decision to exclude the evidence.

Video animation is a powerful evidentiary tool. Because of the medium's ability to deliver information in a persuasive manner and format, video evidence can have greater weight and longer-lasting impact than conventional testimony. *See* 2 *McCormick on Evidence* § 214, at 19 (4th ed. 1992); G. Ross Anderson, Jr., *Computer Animation: Admissibility and Uses,* S.C.Tr.L.Bull. 9, 9 (Fall 1995). Thus, it has the potential to mislead if used improperly. Additionally, video animation requires heightened guarantees of trustworthiness because of its susceptibility to editorial distortion. *See Ban-*

*nister v. Town of Noble,* 812 F.2d 1265, 1269 (10th Cir.1987) (because the creation of trial videos inevitably involves self-serving conduct, admission is not advisable). Moreover, staged video reproductions which stray from original facts create impressions that prove especially difficult to limit. 29A Am.Jur.2d 987, *Evidence* § 987, at 435 (1994); McCormick, *supra,* at 19 (discussing the propensity of staged video to blur lines between art and reality). These three dangers lead courts to react cautiously to the use of video animation evidence and require the judge to act as a "gatekeeper." *E.g., Robinson v. Missouri Pac. R.R. Co.,* 16 F.3d 1083, 1088 (10th Cir.1994).

Because computer animation is a relatively new technological development, case law on the subject is sparse. In some cases, courts have not clearly explained their reasoning concerning the admissibility of computer-generated evidence or provided specific guidelines for admission.[6] Nevertheless, there is a developing consensus which agrees on parameters for the admission of computer-generated evidence and gives the trial court broad discretion in ruling on its admissibility. The common test which emerges from this authority requires that the animated evidence mirror the actual facts of the case and relevant testimony. *See, e.g., Hinkle v. City of Clarksburg, W.Va.,* 81 F.3d 416, 424–25 (4th Cir.1996) (noting in dicta that a computer-animated video tape is essentially like a "real-life recreation" and thus animation must be "sufficiently close" to actual facts) (citing *Gladhill v. General Motors Corp.,* 743 F.2d 1049, 1052 (4th Cir.1984) (videotaped demonstration evidence must be "sufficiently close" to the event in question "to

---

**6.** Anderson, *supra,* at 12, n. 11 (citing *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Richard v. Firestone Tire & Rubber Co.,* 853 F.2d 1258, 1261 (5th Cir.1988), *cert. denied,* 488 U.S. 1042, 109 S.Ct. 868, 102 L.Ed.2d 992 (1989); *Oregon Natural Resources Council v. Marsh,* 820 F.2d 1051, 1058 (9th Cir.1987); *United States v. 1,606.00 Acres of Land,* 698 F.2d 402, 403–04 (10th Cir.1983); *Volkswagen of America, Inc. v. Marinelli,* 628 So.2d 378 (Ala.1993); *Soule v. General Motors Corp.,* 8 Cal.4th 548, 34 Cal.Rptr.2d 607, 617, 882 P.2d 298, 308 (1994); *R.B. Kent & Son, Inc. v. Planning Comm'n of Ledyard,* 21 Conn.App. 370, 573 A.2d 760 (1990); *Murphy v. Kentucky Utilities Co.,* 803 S.W.2d 582 (Ky.Ct.App. 1991); *Hopper v. Crown,* 646 So.2d 933, 937–38 (La.Ct.App.1994), *writ denied,* 651 So.2d 275 (La.1995)).

make the probative value of the demonstration outweigh its prejudicial effect")).[7]

**7.** *Robinson v. Missouri Pacific R.R. Co.*, 16 F.3d 1083, 1087 (10th Cir.1994) (animation admitted where a simulation of accident illustrated expert's theory and where trial court issued limiting instruction to jury not to consider the video as a true recreation); *Bledsoe v. Salt River Valley Water Users' Ass'n*, 179 Ariz. 469, 880 P.2d 689, 691–93 (Ct.App. 1994) (holding trial court erred in admitting videotaped computer simulation on ground that it did not "fairly and accurately depict what it represents"); *Hutchison v. American Family Mut. Ins. Co.*, 514 N.W.2d 882, 890 (Iowa 1994) (video evidence properly excluded where it did not have sufficient factual foundation would have confused jury); *State v. Harvey*, 649 So.2d 783, 788–89 (La.Ct.App.), *writ denied*, 657 So.2d 1026 (La.1995) (affirming admission of computer-generated animations where they illustrated expert's theory and noting importance that reconstructions be "identical or very similar to the scene to have probative value"); *Pino v. Gauthier*, 633 So.2d 638, 652 (La.Ct.App. 1993), *writ denied*, 634 So.2d 858 (La.1994) (computer simulation videotape properly excluded as prejudicial where it portrayed outcomes favorable only to the proponent of the evidence); *Commercial Union v. Boston Edison Co.*, 412 Mass. 545, 591 N.E.2d 165, 168 (1992) (computer model admissible based, in part, on accuracy of input); *Richardson v. State Hwy. & Transp. Comm'n*, 863 S.W.2d 876, 881–82 (Mo. 1993) (affirming exclusion of computer simulation of accident because simulation not conducted under substantially similar conditions to those at the time of the accident); *Bray v. Bi–State Development Corp.*, 949 S.W.2d 93, 99 (Mo.Ct.App.1997) (computer-generated chart admitted because it was accurate and reflected expert's testimony); *Trageser v. St. Joseph Health Ctr.*, 887 S.W.2d 635, 636–37 (Mo.Ct.App.1994) (animated videotape inadmissible where it did not accurately represent what it purported to depict); *Kudlacek v. Fiat S.p.A.*, 244 Neb. 822, 509 N.W.2d 603, 617 (1994) (affirming admission of computer video simulation, in part, based on its conformity to actual dimensions of automobile, marks on roadway, speed, and angle at which vehicle left the roadway); *People v. McHugh*, 124 Misc.2d 559, 476 N.Y.S.2d 721, 723 (N.Y.Sup.Ct.1984) (computer reenactment permissible if it "fairly and accurately" reflects oral testimony and aids jury's understanding of the issue); *State v. Clark*, 101 Ohio App.3d 389, 655 N.E.2d 795, 813, *appeal denied*, 72 Ohio St.3d 1548, 650 N.E.2d 1367 (1995) (computer simulation of crime scene properly admitted, in part, where it was based on actual dimensions of crime scene and relied on police calculations); *Deffinbaugh v. Ohio Turnpike Comm'n*, 67 Ohio App.3d 692, 588 N.E.2d 189, 193–94, *appeal denied*, 55 Ohio St.3d 703, 562 N.E.2d 894 (1990) (computer simulations properly admitted where they accurately depicted the motion of the vehicle in addition to other previously introduced facts); *Sommervold v. Grevlos*, 518 N.W.2d 733, 738 (S.D. 1994) (demonstrative evidence that purports to recreate an event must be "nearly identical" to the event in order to protect against undue prejudice because a computer-generated recreation is a powerful visual

When introduced as demonstrative evidence, a computer-generated reconstruction has secondary relevance.[8] It relies on other material testimony for its own relevance. Stated another way, computer animations must merely illustrate a witness's testimony. To protect this limited function, the proponent of computer-generated evidence must satisfy two tests prior to obtaining its admission. First, the proponent must lay a foundation. Second, the proponent must satisfy a balancing test to show the evidence is more probative than prejudicial.

Establishing a foundation for video animation involves a two-step process. First, computer animations must be relevant and authentic. To establish relevance, the proponent of the evidence must show that the animation relates to other admissible and material evidence. *See* Rule 401, SCRE

---

device that stands out in the jury's mind and is likely to outweigh even the spoken testimony of eye witnesses).

Recent commentary also emphasizes the importance of ensuring that computer animations represent accurately the events and facts they purport to represent. Anderson, *supra*, at 10; I. Neel Chatterjee, *Admitting Computer Animations: More Caution & New Approach Are Needed*, 62 Def.Counsel.J. 36, 40–46 (1995); Gregory P. Joseph, *A Simplified Approach to Computer–Generated Evidence and Animations*, 156 F.R.D. 327, 334 (1994); Kristin L. Fulcher, Comment, *The Jury As Witness: Forensic Computer Animation Transports Jurors to the Scene of a Crime or Automobile Accident*, 22 U.Dayton L.Rev. 55, 69–70 (1996); Evelyn D. Kousoubris, Comment, *Computer Animation: Creativity in the Courtroom*, 14 Temp.Envt'l L. & Tech.J. 257, 258, 270–71 (1995); John Selbak, Comment, *Digital Litigation: The Prejudicial Effects of Computer–Generated Animation in the Courtroom*, High Tech.L.J. 337, 365 (1996).

8. Although courts differ on whether to admit computer-generated animations as demonstrative or novel scientific evidence, Cantrell offered the video animation for demonstrative purposes only, thus delimiting our inquiry. *E.g., Robinson v. Missouri Pac., R.R. Co.*, 16 F.3d 1083, 1086–89 (10th Cir.1994) (holding animation admissible as demonstrative evidence, but expert opinion underlying animation must meet requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which sets out requirements for novel scientific testimony in federal courts). Nevertheless, we find that this distinction has no evidentiary basis and needlessly complicates the admissibility of computer animations. *See* Anderson, *supra*, at 10. To classify animations of known facts as novel scientific evidence confuses the methodology of producing demonstrative evidence with its end result. *Id.*

("relevant evidence" means evidence having any tendency to make more probable a fact of consequence). Second, to establish authenticity, the proponent must first show that the witness whose testimony the animation illustrates is familiar with the animation and that the animation portrays an authentic recreation of the facts. *See* Rule 901(a), SCRE (governing authentication and identification requirements). Finally, the trial court must balance the probative value of the animation against its prejudicial effect. *See* Rule 403, SCRE (governing exclusion of relevant evidence). Because video animations are demonstrative evidence, the trial court has broad discretion in admitting them. *See Holmes v. Black River Elec. Co-op., Inc.*, 274 S.C. 252, 258, 262 S.E.2d 875, 878 (1980); *Brown v. Orndorff,* 309 S.C. 320, 324–25, 422 S.E.2d 151, 153–54 (Ct. App.1992).

Here, the trial court determined that the video animation Cantrell sought to introduce would confuse and mislead the jury. We agree. Cantrell's expert testified that Cantrell was driving twenty-five miles over the speed limit and that she left eighty feet of skid marks prior to the collision. The expert also testified that for the animation to be fair and accurate, it would need to show when Cantrell perceived the hazard relative to the point of impact. The video animation, however, is inconsistent with this testimony. Among other inaccuracies, the video did not accurately portray Cantrell's speed. It also depicted Anderson turning directly in front of Cantrell, which, as indicated by the eighty feet of skid marks, inaccurately depicts the physical evidence and expert testimony. The animation, therefore, was neither relevant nor authentic because (1) it would not have aided the jury in understanding the expert's prior testimony and (2) did not fairly and accurately reflect the evidence to which it relates. *See Holmes,* 274 S.C. at 258, 262 S.E.2d at 878 (demonstrative evidence must aid the jury); Anderson, *supra,* at 10. These same factors bore directly on the animation's undue prejudicial effect. Rule 403, SCRE (relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury). Cantrell, thus, failed to meet her burden as proponent of the evidence.

## B. Diagram

■ Cantrell argues the trial court improperly refused to admit a diagram prepared by her expert as a direct exhibit after the court denied her request to admit her video animation of the scene.[9] This argument is without merit. Cantrell's expert admitted that he had to guess about the position of Clark's car in the road prior to the collision in preparing the diagram. As with the video animation, the diagram also failed to indicate the relative speeds of the vehicles and did not accurately portray the uncontradicted testimony concerning the position of the vehicles prior to the collision. Moreover, other information contained in the diagram had already been introduced to the jury and would have been cumulative. *See* Rule 61, SCRCP (exclusion of cumulative evidence is harmless).

## C. Bond forfeiture

■ Cantrell argues the trial court erred in not allowing her to impeach Anderson and witness William Brantley based on prior convictions. We disagree. First, Anderson never received a shoplifting conviction, but rather forfeited bond after an arrest on this charge. Thus, it may not be used to impeach her credibility pursuant to Rule 609(a)(2), SCRE, which permits impeachment by evidence of a crime of dishonesty or false statement.[10] Bond forfeitures do not constitute an admission of guilt and may not be used for impeachment purposes. *Samuel v. Mouzon*, 282 S.C. 616, 621, 320 S.E.2d 482, 485 (Ct.App.1984). Second, with respect to Brantley, Rule 609(a), SCRE, does not permit mere charges to be used as impeachment evidence. Although Cantrell's attorney mistakenly stated that Brantley admitted to a prior "conviction" in his deposition, the record shows only that he admitted to a charge for this offense. The trial court, therefore, did not abuse its discretion by excluding the evidence.

---

9. The trial court allowed Cantrell's expert to use the diagram as a demonstrative exhibit, but did not allow the jury to use the diagram during deliberations.

10. In *State v. Shaw*, decided after the trial of this case, this court held that a shoplifting conviction constitutes a crime of dishonesty or false statement. 328 S.C. 454, 456–57, 492 S.E.2d 402, 404 (Ct.App.1997).

### D.   Pictures of accident scene

During trial, the court admitted into evidence several photographs and a videotape of the accident scene.   Cantrell argues the trial court erred in admitting this evidence, asserting that S.C.Code Ann. § 56–5–6540(C) prohibits the use at trial of any evidence tending to show that a person was or was not wearing a safety belt at the time of an accident.

Cantrell's reliance on section 56–5–6540(C) is misplaced.   This statute precludes the use of evidence in a civil action showing that a driver or occupant of a motor vehicle failed to wear a safety belt.[11] Anderson's counsel, however, did not attempt to introduce the photographs and videotape for this purpose.   To the contrary, he offered this evidence to demonstrate the severity and extent of the collision, as well as the position of the vehicles at the point of impact.   Other photographs of the scene, he explained, did not depict the detail of the damage done to the interior of the Oldsmobile. As the trial court noted, "The Court cannot exorcise the facts. . . .   The photographs fairly and accurately reflect the whole scene."   We agree with this assessment.   Furthermore, the trial court instructed the jury to disregard any evidence related to the safety belts.   Cantrell, therefore, suffered no prejudice.

We also find no error in the trial court's decision to admit a videotape of the scene which included footage of James' body covered by a sheet.   The video, made by a news reporter following the accident, was the only one of the scene showing the position of the vehicles, the surrounding area, and blinking hazard lights of Cantrell's car.   As noted by the trial court, the jury had already heard ample testimony concerning James' death after the wreck prior to the video's admission. Moreover, the attorneys redacted the video so that the jury

---

11.   In 1989, the General Assembly passed a statute requiring all drivers and occupants of motor vehicles to use safety belts, but simultaneously refused to allow the use of evidence of a violation of this statute in any civil action.   S.C.Code Ann. §§ 56–5–6520 & 56–5–6540(C) (1991). Two years previously, the South Carolina Supreme Court invited this legislative action by refusing to allow defendants to introduce a plaintiff's failure to use a safety belt as evidence of the plaintiff's contributory negligence, absent an affirmative statutory duty.   *Keaton v. Pearson,* 292 S.C. 579, 580, 358 S.E.2d 141, 141–42 (1987).

did not see emergency medical workers carrying James' body into the ambulance. At no time was James' body exposed. Therefore, we agree with the trial court's conclusion that admission of the video did not rise to the level of unfair prejudice.

We have considered Cantrell's remaining arguments: that the deposition testimony of witnesses Brantley and Lowe should have been read into the record, that the trial court erred in refusing to strike certain sections of Lowe's and Brantley's depositions, and that the trial court erred in allowing Trooper James Chastain to testify that Cantrell laughed repeatedly during his interview with her the day after the wreck. We hold that these arguments have no merit and do not warrant further discussion. *See* Rule 220(b)(2), SCACR, and the following authorities: Rules 32(a)(3)(A), (C), & (E), SCRCP (permitting the use of depositions upon a showing that a witness is unable to testify due to distance, location out-of-state, illness, or other exigent circumstances); Rule 803(1), SCRE (a statement describing or explaining an event made while the declarant was perceiving the event is admissible under the present sense impression exception to the hearsay rule); Rule 701, SCRE (lay witnesses may offer testimony in the form of opinions or inferences if the opinions or inferences are rationally based on the witness's perception, aid the jury in understanding testimony, and do not require special knowledge); Rule 801(d)(2)(A), SCRE (statements made by a party-opponent are not hearsay); *Knoke v. South Carolina Dep't of Parks, Recreation & Tourism,* 324 S.C. 136, 143, 478 S.E.2d 256, 259 (1996) (no reversible error where the challenged testimony was merely cumulative and not prejudicial); *Doe v. S.B.M.,* 327 S.C. 352, 356–57, 488 S.E.2d 878, 880–81 (Ct.App. 1997) (a timely objection must be made to preserve an alleged error for appellate review).

For the foregoing reasons, the jury's verdict is

**AFFIRMED.**

GOOLSBY and STILWELL, JJ., concur.